IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| APEX ABRASIVES, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>WGI HEAVY MINERALS, INC.,<br>WGI HEAVY MINERALS, LLC, and<br>DOE BUSINESS ENTITIES 1-3,<br>inclusive,<br><br>Defendants. | CV 14–37–BU–DWM<br><br>OPINON<br>and ORDER |

This case arises out of a dispute over the production and sale of commercial-grade garnet. Plaintiff Apex Abrasives, Inc. ("Apex") alleges that following its construction of a garnet processing facility in Glen, Montana, it was forced to cease operations and liquidate its inventory because Defendants WGI Heavy Minerals, Inc. and WGI Heavy Minerals, LLC (collectively "WGI") violated the parties' purchase agreement. Apex alleges constructive fraud/inducement (Count 1); negligent misrepresentation (Count 2); breach of contract (Count 3); and breach of the implied covenant of good faith and fair dealing (Count 4), requesting both compensatory and punitive damages. (Third Amend. Compl., Doc. 207.) WGI seeks summary judgment on Counts 1, 2, and 4, as well as on Apex's

1

punitive damages claim. (Doc. 221.) WGI further seeks to limit certain "loss" and "lost profits" evidence at trial. (Doc. 224.) WGI's partial motion for summary judgment is granted in part and denied in part. WGI's motion in limine is denied.

## FACTUAL BACKGROUND

The facts are largely undisputed, (*see* Docs. 223, 230; Sched. Order, Doc. 205 at ¶ 3), but to the extent disputes exist, the record is viewed in the light most favorable to Apex, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

Apex, a Montana corporation, owns a garnet processing facility near Glen, Montana. (Doc. 205 at ¶ 3(a).) WGI is an Idaho corporation, (*id.* at ¶ 3(b)), that is in the business of mining and marketing garnets for industrial uses, (Doc. 230 at ¶ 2). In 2005, the parties first met to explore potential business arrangements related to the production and sale of Apex garnets. (Doc. 205 at ¶ 3(c).) In October 2005, WGI produced a "Letter of Intent" in which WGI expressed an interest in an exclusive business relationship with Apex. (Ex. B, Doc. 231-2.) Apex declined, but the parties continued to communicate and WGI consistently touted its ability to market and sell garnet and, in 2006, proposed that Apex build a garnet facility. (Ex. F, Doc. 231-6 at 2.)

Following protracted negotiations, the parties entered into a Marketing and Sales Agreement ("Agreement") on November 18, 2009. (Doc. 230 at ¶¶ 3–8.) The Agreement was for a three-year term stating, *inter alia*, "Apex agrees to sell to

WGI, and WGI agrees to purchase from Apex, a minimum of 5000 short Tons of Garnet in Year 1, and 10,000 short Tons per calendar year thereafter during the Term." (Agree. ¶ 3.1, Ex. S, Doc. 231-20).[1] WGI was given the option to purchase garnet in excess of the minimum quantities. (*Id.*) The specific size and quality of the garnet was identified in Attachment A to the Agreement, which provided for #80 waterjet grade. (*See id.* at 8.)

The Agreement's termination provision allowed either party to terminate without penalty upon 180-days' written notice or within 30 days of an uncorrected breach by the other party. (*Id.* at ¶¶ 5, 6.) The Agreement defined breach as:

> a) Any failure to perform the terms and conditions of this Agreement;
> b) Failure by Apex to supply minimum quantities of specified individual grades of garnet, as shown in this Agreement;
> c) Failure of Apex to make regular and sufficient shipments of garnet;
> d) Failure of WGI to purchase the minimum quantities of garnet called for in this Agreement; [or]
> e) Failure of WGI to pay for product.

(*Id.* at ¶ 6.1.)

In Year 1 of the Agreement (2010), Apex produced approximately 600 tons of #80 garnet based on purchase orders it received from WGI.[2] (Doc. 230 at ¶ 10.) On September 2, 2011, Apex sent WGI a Notice of Breach, stating that WGI had

---

[1] The Agreement filed at Doc. 223-1 is incomplete, so Doc. 231-20 is cited here.
[2] The Agreement recognized that it was possible Apex would not meet its production goals in the first year. (*See* Agree. ¶ 3.1, Doc. 231-20 ("In such event of insufficient inventory in Year 1, Apex will not be held in breach.").)

not complied with the requirements of the Agreement. (*Id.* at ¶ 11; Doc. 205 at ¶ 3(e).) On October 5, Apex gave WGI written notice that Apex was terminating the Agreement due to the breach. (Doc. 230 at ¶ 12.) WGI purchased no garnet from Apex in Year 3 (2012), or in any year thereafter. (Doc. 205 at ¶ 3(f).) Apex is seeking to recover from WGI approximately $8.4 to $18.1 million for loss of sales over a 15-year period of production based on known reserves at volumes and rates provided for in the Agreement. (Doc. 230 at ¶ 14.)

## PROCEDURAL BACKGROUND

This action was originally filed in state court and removed to this Court in June 2014. (Doc. 1.) Following numerous pretrial motions and conferences, (*see* Docs. 31, 35, 37, 96, 113, 116, 118, 120), a jury trial was held before Judge Haddon in December 2016, (*see* Min. Entries, Docs. 141, 142, 144, 145, 151, 152). Prior to the presentation of WGI's case, Judge Haddon granted WGI's Rule 50 motion, (*see* Docs. 152, 157), and judgment was entered in favor of WGI, (Doc. 156). Apex appealed. (Doc. 165.) In June 2018, the Ninth Circuit reversed and remanded in an unpublished memorandum disposition.[3] (Doc. 192.) The Ninth Circuit held that the Agreement unambiguously mandated Apex to "sell" and WGI to "purchase" 25,000 tons of garnet over the three-year term and that any

---

[3] The Ninth Circuit affirmed a number of Judge Haddon's pretrial rulings that are not relevant here. (*See* Doc. 192 at 4.)

modification of those terms was a jury question. (*Id.* at 2–3.) On remand, the case was reassigned, (Docs. 194, 197), a preliminary pretrial conference held on October 16, 2018, and trial set for September 30, 2019, (*see* Doc. 205).

## SUMMARY CONCLUSION

Despite the Ninth Circuit's explicit direction that the issues in this case be tried to a jury, WGI seeks to judicially narrow Apex's case to a breach of contract claim with no damages. And, it seeks to do so by stretching the parol evidence rule beyond its logical bounds. With the exception of Apex's claim for tortious breach of the implied covenant and the attendant claim for punitive damages, Apex's case survives summary judgment. Similarly, a jury must decide whether the damages sought by Apex were reasonably foreseeable.

## LEGAL STANDARDS

### I. Motion for Summary Judgment

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude summary judgment. *Id.* at 248. Because this Court sits in diversity, the substantive law of Montana, the

forum state, applies. *Med. Lab. Mgmt. Consuls. v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

II.     **Motions in Limine**

"A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). Courts have broad discretion in ruling on motions in limine. *Frost v. BNSF Ry. Co.*, 218 F. Supp. 3d 1122, 1133 (D. Mont. 2016). A motion in limine should be granted only when the evidence at issue is "inadmissible on all potential grounds." *Id.* (internal quotation marks omitted).

## ANALYSIS

I.     **Constructive Fraud (Count 1) & Negligent Misrepresentation (Count 2)**

WGI seeks summary judgment on Apex's claims of fraud and negligent misrepresentation on the ground that the November 2009 Agreement represents the full and final agreement between the parties regarding Apex's garnet facility and the parties' sales agreement. In response, Apex argues that misrepresentations and reliance related to the construction of its garnet facility, the sole basis for Counts 1 and 2, are separate from the Agreement. Apex has the better argument.

Pursuant to the parol evidence rule, "The execution of a contract in writing . . . supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Mont. Code Ann.

6

§ 28–2–904. But there is an exception to the rule when fraud is alleged. Mont. Code Ann. § 28–2–905(2). This exception only applies, however, "when the alleged fraud does not relate directly to the subject of the contract. Where an alleged oral promise directly contradicts the terms of an express written contract, the parol evidence rule applies." *Sherrodd, Inc. v. Morrison-Knudsen Co.*, 815 P.2d 1135, 1137 (Mont. 1991).

According to Apex, Counts 1 and 2 deal exclusively with the construction of Apex's garnet facility. The Agreement, on the other hand, "define[s] an arrangement by which the garnet minerals and related products produced by Apex are marketed and sold and purchased by WGI at economic returns and under conditions that are acceptable to both parties." ("Purpose," Doc. 231-20 at 2.) The Agreement includes only passing references to Apex's facility (e.g., the "mining operation" or "mine site at Glen, Montana") with the exception of one statement: "WGI and Apex both recognize that Apex is completing plant construction to produce garnet products." (*Id.* at ¶ 3.1.) While WGI insists all allegations of misrepresentation directly relate to the subject matter of the Agreement—i.e., WGI's purchase of garnet from Apex—Counts 1 and 2 do not seek to enforce the minimum purchase amounts or the contract price. Rather, the alleged misrepresentations and harmful reliance arise out of the $1 million construction of Apex's garnet facility. Because the written agreement does not address the

7

facility, potentially fraudulent statements related to the facility may be considered. *See Sherrodd, Inc.*, 815 P.2d at 1137.

Accordingly, Counts 1 and 2 survive summary judgment.

## II. Implied Covenant & Punitive Damages (Count 4)

WGI seeks summary judgment on Apex's claims for tortious breach of the implied covenant of good faith and fair dealing and punitive damages on the ground that there was no special relationship between the parties. Apex does not argue that a special relationship exists. Rather, Apex argues that it is entitled to pursue its tort claims in the alternative to its breach of contract claims. (Doc. 228 at 30–32.) Apex misses the point.

"[E]very contract, regardless of type, contains an implied covenant of good faith and fair dealing." *Story v. Bozeman*, 791 P.2d 767, 775 (Mont. 1990), *overruled on other grounds by Arrowhead Sch. Dist. No. 75 v. Klyap*, 79 P.3d 250 (Mont. 2003). A covenant of good faith requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Mont. Code Ann. § 28–1–211. "The covenant is a mutual promise implied in every contract that the parties will deal with each other in good faith and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance." *Knucklehead Land Co., Inc. v. Accutitle, Inc.*, 172 P.3d 116, 121 (Mont. 2007) (internal quotation marks omitted). In most cases, the

8

breach of this covenant is "only a breach of the contract and only contract damages are due." *Story*, 791 P.2d at 775. "However, a claim may be brought for tortious breach . . . where a 'special relationship' exists between the parties." *Puryer v. HSBC Bank USA*, 419 P.3d 105, 112 (Mont. 2018) (quoting *Story*, 791 P.2d at 776). The existence of a "special relationship" requires unequal bargaining power between the parties with knowledge that one party is especially vulnerable, a non-profit motive, and a harm that cannot be remedied through ordinary contract damages. *Id.* (outlining the five elements of a special relationship). Thus, while Apex can plead in the alternative, it must show the existence of a "special relationship" in order to be eligible for tort damages as a matter of law. Apex has failed to do so. And, review of the record indicates that at least one of the necessary factors, "non-profit motive," is absent. "If substantial evidence is not presented in support of each and all of the essential elements, the court shall direct there is no special relationship." *See Warrington v. Great Falls Clinic, LLP*, 443 P.3d 369, ¶¶ 15, 19 (Mont. 2019) ("The five elements are conjunctive, and thus the failure to prove one defeats the entire claim.").

While Apex can pursue an implied covenant claim insofar as that claim arises out of contract, summary judgment is granted in favor of WGI on any claim for tortious breach. And, in the absence of a claim for tortious breach, Apex's

dependent allegation for punitive damages also fails. *See* Mont. Code Ann. § 27−1−220(2)(a)(i).[4]

## III. Lost Profits

Finally, WGI seeks to limit, either through summary ruling or ruling in limine, Apex's claim for future lost profits. As a preliminary matter, because some of Apex's tort claims survive, it can seek damages beyond those recoverable in contract. Insofar as contract damages are concerned, WGI improperly seeks to take the determination of consequential damages from the jury.

### A. Notice Period

Damages in a breach of contract action are measured by "the amount which will compensate the party aggrieved for all the detriment which was proximately caused thereby or in the ordinary course of things would be likely to result therefrom." Mont. Code Ann. § 27−1−311. "[C]ontract damages are those that are reasonably foreseeable or within the contemplation of the parties at the time of entering the contract." *Farmers Ins. Exch. v. Goldan*, 378 P.3d 1163, 1172 (Mont. 2016). Here, the Agreement allowed either party to terminate the contract under three circumstances: (1) without penalty and for any reason on 180 days' notice;

---

[4] The Third Amended Complaint limits Apex's claim for punitive damages to Count 4 and the implied covenant. Apex makes no argument that its punitive damages claim should survive absent its claim for tortious breach.

(2) as a result of the other party's breach upon 30 days' notice; or (3) immediately in the event of insolvency of bankruptcy. (Doc. 231-20 at ¶ 5.)

WGI unpersuasively argues that Apex's claim for lost profits should be limited to either 30 or 180 days. At the time the parties entered into the Agreement, it was reasonable for Apex to assume that WGI could terminate the agreement for any reason if it gave 180-days' notice. Apex would not be entitled to any damages if WGI did so. But, it was also reasonable for Apex to assume that if WGI breached the contract by failing to comply with its purchase terms, Apex "would be entitled [to prove that breach] and recover [its] full measure of damages resulting from the wrongful breach, as permitted under § 27−1−311, MCA." *Farmers Ins. Exch*, 278 P.3d at 1172. The Agreement even states that termination following breach was not intended to be "exclusive of any other remedy herein or by law provided or permitted." (Doc. 231-20 at ¶ 6.2.) Thus, lost profits are not limited by the Agreement's notice provisions.

### B. Three-Year Minimum Purchase Term

Alternatively, WGI argues that Apex's lost profits should be limited to the three-year term of the Agreement because damages beyond the first three years' minimum purchase requirement are speculative. "Damages which are not clearly ascertainable in both their nature and origin cannot be recovered for a breach of contract." § 27−1−311. And, "[a] person may not recover a greater amount in

damages for the breach of an obligation than the person could have gained by the full performance of the obligation on both sides . . . ." Mont. Code Ann. § 27–1–303. While WGI is correct that the Agreement only contains minimum purchase amounts for three years, the Agreement contains an annual automatic renewal provision. (*See* Doc. 231-20 at 2) ("After the initial 3 years, the Agreement shall automatically renew on January 1 each year for a period of one year unless terminated according to Article 5.").) Considered in conjunction with WGI's representations regarding the garnet market, (*see* Ex. NN, Doc. 231-43 at 2 (2005 email indicated WGI estimate of "35-38 thousand tons of saleable material insay [sic] 4 years"); Ex. F, Doc. 231-6 at 2 (2006 meeting notes: "[m]arket could easily absorb 20,000 tons/year of Apex – market is growing"); Ex. I, Doc. 231-9 at 3 (2008 email indicating WGI thought Apex facility could produce 25,000 tons of product per year)), the automatic renewal provision expands what a jury could conclude was the reasonably foreseeable loss to Apex beyond a three-year term.

### C. Double Recovery

WGI argues that any claim for lost profits should be limited because Apex could still mine, process, and sell its garnet reserves, which would result in double recovery. But this fact is at the very heart of this case: whether WGI's conduct led to the shuttering of the Apex facility. Thus, this is a fact for the jury to assess in determining a damage amount, if any.

### C. "Mids" and Tungsten Byproduct

WGI seeks to exclude testimony or evidence regarding losses related to non-#80 garnet, such as "mids" and tungsten by-product. While the parties' Agreement primarily governs the sale and purchase of #80 garnet, the "Purpose" section of the Agreement references "related products" and Attachment A establishes a price of $0.08 per pound for "OTHER GARNET RELATED MATERIAL." (Doc. 231 at 2, 8.) Even though there was no minimum purchase requirement for these goods, the contract contemplates their sale, which is enough to let the jury decide the extent of Apex's damages, if any, related to those materials.

### D. Shareholders

Finally, WGI seeks to exclude evidence or testimony of losses suffered by individual shareholders of Apex. Apex concedes in its response that none of the individual shareholders are seeking damages in this case. Thus, it seems that WGI's motion is a moot point. To the extent WGI seeks to limit testimony about actions taken by the shareholders to keep Apex afloat in light of WGI's alleged conduct, such evidence is relevant to losses sustained by Apex, the corporation. Such loss is directly at issue in the case.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that WGI's partial motion for summary judgment (Doc. 221) is GRANTED as to Apex's claim for tortious

13

breach of the implied covenant and punitive damages as alleged in Count 4 of the Third Amended Complaint. It is DENIED in all other respects.

IT IS FURTHER ORDERED that WGI's motion in limine (Doc. 224) is DENIED.

DATED this 24th day of July, 2019.

Donald W. Molloy, District Judge
United States District Court